OLIVER v. KAUFMAN.

[See Case No. 10,497.]

---

## Case No. 10,497.

OLIVER et al. v. KAUFFMAN et al.

[Scr. Bk. 170; 1 Am. Law Reg. 142; 9 Leg. Int. 152.] [1]

Circuit Court, E. D. Pennsylvania. Oct., 1850.

SLAVERY — HARBORING FUGITIVES — "NOTICE" — WHAT MUST BE SHOWN IN ACTION FOR DAMAGES.

[1. The word "notice," as used in Act Cong. Feb. 12, 1793, § 4 (1 Stat. 305), making it an offense to harbor or conceal a person "after notice that he is a fugitive from labor," means "knowledge."]

[2. The harboring of a fugitive from labor made criminal by such act is the lending of encouragement to the fugitive in his desertion of his master, to further his escape, and to impede and frustrate his reclamation, not mere acts of kindness and charity.]

[3. In an action on the case for harboring and concealing plaintiff's fugitive slaves. plaintiff must show that the slaves were lost to him by defendant's illegal interference. or that some other loss, injury. or damage was suffered by him in consequence thereof.]

This was an action on the case by Cecilia Oliver and others, by their next friend, Eli Stake, against Daniel Kauffman, Stephen Weakley, and Philip Breckbill, for damages caused by their illegal harboring and secreting of plaintiffs' fugitive slaves.

H. M. Watts, C. B. Penrose, and W. B. Reed, for plaintiffs.

Thaddeus Stevens, for defendants.

GRIER, Circuit Justice (charging jury). The plaintiffs in this action are Cecilia Oli-

---

1 [Published from Scrap Book in the custody of the clerk of the circuit court for the Eastern district of Pennsylvania. 1 Am. Law Reg. 142. and 9 Leg. Int. 152, contain only partial reports.]

ver, Ellen R. Oliver, and Catharine Oliver. They are the minor children of Shadrach S. Oliver, and sue by their next friend, Eli Stake. Shadrach S. Oliver, their father, had formerly resided in Maryland, and removed to the state of Arkansas, where he died in February, 1846. He was owner of certain slaves. His estate was settled up, and the property amicably divided between his widow and children. Twelve slaves, consisting of two husbands and their wives and their children, were allotted to the plaintiffs. In May, 1847, the mother returned to Williamsport, Maryland, taking with her the plaintiffs. her children, and their slaves. On their way they passed through Pennsylvania, on the National road between Wheeling and Cumberland. In October, 1847 (from 10th to 15th), these slaves fled to Pennsylvania, and were pursued by the agent and friend of the plaintiff for the purpose of recapturing them and taking them back. In this attempt they were unsuccessful. The fugitives were traced through Chambersburg into Cumberland county. This action has been brought in the name of these infant children against the defendants, Stephen Weakley, Daniel Kauffman, and Philip Breckbill, citizens of Cumberland county. It is an action on the case. The declaration sets forth: 1. That plaintiffs are citizens of the state of Maryland, and were owners of twelve certain negroes, who, by the law of Maryland, were held to labor and service by the plaintiffs. That in October, 1847, the said twelve negroes made their escape from the plaintiffs, and came into Cumberland county, Pa., where the plaintiffs, by the constitution and laws of the United States, had a right to pursue and arrest and take said fugitives, and cause them to return to their owners, in Washington county, Maryland. But the defendants, well knowing the premises, and contriving and fraudulently intending to deprive the plaintiffs of the labor and services due to them by said fugitives, did tortiously and illegally harbor and conceal the said twelve negroes, knowing them to be fugitives from labor, and enticed, persuaded, and assisted them to escape from and leave the labor and service of the plaintiffs, and obstructed and hindered them from seizing, arresting, and recovering said slaves, whereby they were wholly lost to the plaintiffs. 2. The second count of the declaration charges the defendants with illegally enticing, persuading, procuring, aiding, and assisting said twelve negroes to absent themselves from and wholly to leave and escape the service and labor of plaintiffs. 3. The third count, after stating the ownership and escape of the slaves, substantially as in the first, and the right of plaintiffs to pursue and reclaim them, charges that the defendants, well knowing the premises, illegally and fraudulently harbored and concealed them, whereby they escaped from the labor, etc. Damages laid at $20,000.

To these charges the defendants have pleaded that they are not guilty. And whether they are guilty, or not, of the conduct so charged, is the question which it is your duty to decide, under the instructions of the court as to the law. (The judge here read from his charge to the jury in a late case tried at Pittsburgh. Van Metre v. Mitchell [Case No. 16,864].) To men of your intelligence, it is perhaps unnecessary to remark that in order to discharge the duty you have sworn to perform, of rendering a true verdict on the issues presented to you, the law of the land, as stated to you by the court, and applied by you to the facts of the case, constitute the only elements of such a verdict. No theories or opinions which you or we may entertain with regard to liberty or human rights, or the policy or justice of a system of domestic slavery, can have a place on the bench or in the jury box. We dare not substitute our convictions or opinions, however honestly entertained, for the law of the land.

[2] [In the performance of your duty on this subject, it will be proper that you suffer no prejudice to affect your minds, either for or against either of the parties to this suit. The odium attached to the name of "Abolitionist" (whether justly or unjustly, it matters not), should not be suffered to supply any want of proof of the guilty participation of the defendants in the offence charged, even if the testimony in the case should satisfy you that the defendants entertained the sentiments avowed by the class of persons designated by that name. The defendants are on trial for their acts, not for their opinions. Beware, also, that the occasional insolence and violent denunciation of the South be not permitted to prejudice your minds against the just rights guaranteed to them by the constitution and laws of the Union. An unfortunate occurrence has taken place since the former trial of this case, which, as it is a matter of public history, and as such has been introduced into the argument of this case, it becomes the unpleasant duty of the court to notice in connection with this portion of our remarks. A worthy citizen of Maryland, in attempting to recapture a fugitive, was basely murdered by a mob of negroes on the southern borders of our state. That such an occurrence should have excited a deep feeling of resentment in the people of that state, was no more than might have justly been expected. That this outrage was the legitimate result of the seditious and treasonable doctrines diligently taught by a few vagrant and insane fanatics, may be admitted. But by the great body of the people of Pennsylvania, the occurrence was sincerely regretted, and an anxious desire was entertained that the perpetrators of this murder should be brought to condign punishment. Measures were tak-

---

[2] [From 1 Am. Law Reg. 142.]

en, even at the expense of sending a large constabulary and military force into the neighborhood, to arrest every person, black and white, on whom rested the least suspicion of participation in the offence. A large number of bills of indictment were found against the persons arrested for high treason, and one of them was tried in this court. The trial was conducted by the attorney general of the state of Maryland; and although it was abundantly evident that a riot and murder had been committed, by some persons, the prosecution wholly failed in proving the defendant, on trial, guilty of the crime of treason with which he was charged. But, however much it was to be regretted that the perpetrators of this gross offence could not be brought to punishment, the court and jury could not condemn, without proof, any individual, to appease the justly offended feelings of the people of Maryland. Unfortunately, a different opinion with regard to our duty in this matter, seems to have been entertained by persons holding high official stations in that state; and certain official statements have been published, reflecting injuriously upon the people of Pennsylvania and this court, which have tended to excite feelings of resentment, and to keep up a border feud, which, if suffered to have effect in our courts, or in the jury-box, may tend to prejudice the just rights of the people of Maryland, and of the plaintiffs in this case. These offensive documents, I have reason to believe, are neither a correct exhibition of the good sense and feelings of the people of that state, nor of the legal knowledge and capacity of its learned and eminent bar. It would do them great wrong to suppose them incapable of understanding the legal proceedings, which have been made the subject of so much reprehension, or capable of misrepresenting them. It is your duty to treat with utter disregard ignorant and malicious vituperation of fanatics and demagogues, whether it come from North or South, and give to the respective parties such protection of their respective rights as the constitution and the laws of our country secure to them. I have urged these considerations on your attention more at length, because they have been the subject of much comment by counsel. The foundation of the legal rights now asserted on behalf of the plaintiffs, is found in the constitution of the United States.] [2]

The extradition of criminals or slaves escaping from one country to another has generally been considered a matter of comity and not of right; and the common law and law of nations which refuse to deliver up persons guilty of mere political offences most probably have borrowed this principle from the Jewish code (Deut. c. 23, v. 15): "Thou shalt not deliver unto his master the servant which has escaped from his master unto thee," etc. The institutions of the Jews, while they tolerated slavery, and would not permit the harboring or concealing of the slave of one Jew by another, nevertheless forbade their extradition when they escaped into Judea from a gentile or foreign nation. And therein our own laws are assimilated to theirs. While we would not deliver up slaves escaping from foreign nations, the people of these United States, as one people, united under a common government, have bound themselves, by the great charter of their Union, to deliver up slaves escaping from one state into another. "Whatever may be our private opinions (says Chief Justice Tilghman) on the subject of slavery, it is well known that our Southern brethren would not have consented to become parties to a constitution under which the United States have enjoyed so much prosperity unless their property in slaves had been secured." This constitution has been adopted by the free consent of the people of Pennsylvania, and it is the duty of every man to give it a fair and candid construction, and carry it into full force and effect.

The provision of the constitution (article 4, § 3) is as follows: "No person held to service or labor in one state under the laws thereof, escaping into another, shall, in consequence of any law or regulation thereof, be discharged from such labor or service, but shall be delivered up on claim of the party to whom such service or labor may be due." It declares, also (article 6, § 2), "that this constitution and the laws of the United States, made in pursuance thereof, shall be the supreme law of the land, and the judges of every state shall be bound thereby, anything in the constitution or laws of any state to the contrary notwithstanding." By virtue of this clause of the constitution the master might have pursued and arrested his fugitive slave in another state, he might use as much force as was necessary for his reclamation, he might find and secure him so as to prevent a second escape. But as the exercise of such a power, without some evidence of legal authority, might lead to oppression and outrage, and the master, in the exercise of his legal rights, might be obstructed and hindered, it became necessary for congress to establish some mode by which the master might have the form and support of legal process, and persons guilty of improper interference with his rights might be punished. For this purpose the act of congress of 12th February, 1793, was passed. By the third section of this act, the master or his agent is empowered to seize and arrest the fugitive, and take him before a judge or magistrate, and, having proof of his ownership, obtain a certificate, which should serve as a legal warrant for removing the fugitive. The fourth section describes four different offences: 1st, knowingly and willfully obstructing the claimant in seizing or arresting the fugitive;

[2] [From 1 Am. Law Reg. 142.]

2nd, rescuing the fugitive when so arrested; 3d, harboring; 4th, concealing such person after notice that he is a fugitive from labor. Jones v. Van Zandt [Case No. 7,501]. Under this statute you will observe that a penalty of five hundred dollars is incurred for harboring or concealing a fugitive, which the party injured may recover, but the present action is not for this penalty. In this suit, the plaintiff is only entitled to recover the damages he has actually sustained by the acts of the defendants. You will first determine whether the proof, under the principles here laid down, entitles the plaintiff to recover. And, if they be so entitled, you will then have to consider the amount of damages.

In order to entitle the plaintiffs to your verdict, they must have proved to your satisfaction: 1. That the slaves, or persons held to labor, mentioned in the declaration, or some of them, were by the laws of Maryland the property of the plaintiffs, or, as the statute expresses it, that their labor and services were due to the plaintiffs for life, or a term of years. 2. That these persons so held to labor escaped to the state of Pennsylvania. 3. That the defendants, or some of them, aware of these facts (having notice or knowledge that the persons harbored or concealed were fugitives from labor), did harbor or conceal them contrary to the true intent and meaning of the statute. 4. And, if you find these facts in favor of plaintiff, the amount of the damage, injury, or loss sustained by the plaintiff in consequence of such harboring or concealing.

On the first two points, there is no contradictory testimony. But while the escape of the twelve negroes has not been disputed, the defendants' counsel contend that the facts, as proved, do not show that the fugitives were slaves, or the property of the plaintiffs, but, on the contrary, that they were free. That the fugitives were the property of Shadrach S. Oliver at the time of his death, and that the plaintiffs, his children, became their owners by succession, has not been controverted; but it is contended that the negroes had become free by the act of the plaintiffs: 1st. By taking them into the state of Maryland contrary to a law of that state. 2d. By voluntarily bringing them into the state of Pennsylvania. But as the proof of this subject rests entirely on the evidence given by plaintiffs, and has not been contradicted, the counsel have consented, at the suggestion of the court, that the questions of law arising thereon shall be reserved for future consideration if necessary. You will therefore proceed to consider this case as if the court had instructed you that these objections do not affect the plaintiffs' title, and find your verdict on the other point—and if on that you find for the plaintiffs we will endeavor to put the case in the shape of a special verdict, so that the case may be reviewed if necessary.

[2] [It has been contended that these slaves became free by the act of the plaintiffs in voluntarily bringing them into the state of Pennsylvania. This question depends on the law of Maryland, and not of Pennsylvania. This court cannot go behind the status of these people where they escaped. We know of no law or decision of the courts of Maryland, which treats a slave as liberated, who has been conducted by his master along the National road through the state of Pennsylvania. On this subject, Lord Mansfield has said some very pretty things (in the Case of Somerset), which are often quoted as principles of the common law. But they will perhaps be found, by examination of later cases, to be classed with rhetorical flourishes rather than legal dogmas. Since the former trial of this case, the point has been decided in the supreme court, as I think. But, however that may be, the point is ruled in favor of the plaintiffs, for the purposes of the present case, as we desire to have your verdict on the facts of the case, which are so much contested. Whether the plaintiffs could have sustained an action on the case on the mere guarantee of their rights as contained in the constitution, we need not inquire. The action has been instituted with reference to the terms used in the act of congress of 1793. The fine inflicted by that act can be no longer recovered, because the act of 1850 [9 Stat. 462], having changed the penalty, has thereby repealed the act of 1793 to the extent to which it has been thus supplied. But the statute, so far as it gave an action on the case for harboring and concealing, has not been supplied or repealed.] [2]

The question to which your attention will be chiefly directed is whether the defendants, or either of them, have harbored or concealed the fugitives contrary to the true meaning of the act of congress. For this action is upon the statute, and could not be sustained at common law. The statute gives, not only an action for a penalty of $500 against the person offending against it but also an action on the case for the special injury which may have accrued to the master or owner. But in this action the plaintiffs must show, not only that the defendants have acted contrary to the statute, but that loss, damage, or injury has been caused to the plaintiffs by such illegal interference. The act of congress contemplates pursuit and recapture, and the conduct prohibited is such as tends and is intended to hinder, obstruct, or prevent such reclamation. In case of a rescue of a captured fugitive, or of an illegal interference to hinder such recapture, when the master had it in his power to effect it, the defendant would be liable, not only to the penalty, but also to pay the full value of the slave thus rescued, and even punitive or exemplary damages, as in other actions for a tort. But, where the offence alleged is harboring or

---

[2] [From 1 Am. Law Reg. 142.]

concealing, the plaintiff, if he would recover more than nominal damages, must show that the slave was lost to him in consequence 'of such illegal harboring or concealing. In the case of the harboring of an apprentice who had left his master, the common law gave an action on the case to the master, because it considered it a wrong or injury to the master that his neighbor should encourage or protect his absconding apprentice, instead of sending him back to his master. But the principles of natural or national law, drawn probably from the Jewish code, did not require that a slave who had escaped from bondage, or one charged with merely political offences, should be delivered up. Hence, if these states had continued to be independent governments, foreign to each other, or without any political connexion or union, the state of Pennsylvania would not have been bound to deliver up a fugitive slave, nor could an action have been maintained by a citizen of a foreign state against a citizen of this state for harboring or concealing the fugitive. But one of the great objects of this union, and the constitution, which we are bound to support, and which is the supreme law of the land, is to make us in many respects one people or nation. And it is well known that the Southern states would not have become parties to this Union, but for the solemn compact of the other states to protect their rights in this species of property. This constitution, and these laws enforcing it, are binding on the conscience of every good citizen and honest man, so long as he continues to be a citizen of the United States or of Pennsylvania, while Pennsylvania continues to be a member of this Union. Those who are unwilling to acknowledge the obligations which the law of the land imposes upon them should migrate to Canada, or some country whose institutions they prefer, and whose institutions do not infringe upon their tender consciences. But while they claim the benefits of the Union they cannot repudiate its obligations. The people of Pennsylvania are opposed to the institutions of slavery, and have abolished it within their borders. But they acknowledge the right of other states to make their own institutions, and the obligation imposed upon us to regard the solemn compact which we have made with the sister states. And, however it may suit the taste of a few individuals to denounce the compromises of this Union as "odious." Pennsylvanians both see and feel the impolicy and folly of making their territory a city of refuge for the refuse population of other states. We resent the conduct of foreign nations who cause their white paupers and criminals to be transported into our cities, and have in some instances compelled them to be returned to their own governments; and our compact with our sister states does not compel us to submit to such a grievance from them. It would seem, therefore, to be as inconsistent with our true policy, as it is with our solemn obligations to our fellow citizens of the Southern states of the Union, to encourage the immigration of fugitives, or interfere with their covenanted right of reclamation.

Much has been said during the discussion of this case, by learned counsel. on this unfortunate subject of slavery, as one which has perverted the moral sentiments of many of our citizens, both North and South. and originated peculiar notions. hostile to the stability of this Union. But if such be the case, as I hope it is not, I think it due to the good citizens of Pennsylvania to state my belief that the moral disease engendered by this morbid epidemic has infected but a small number. Conventions for plotting disunion (which would be certainly followed by civil war and bloodshed), for defiling the graves and maligning the memories of the patriots of the Revolution. for reviling and denouncing the officers of our government, and all those who support and uphold our institutions, have hitherto met with little encouragement from any persons who profess a regard for religion, morality, or the law of the land. It is, perhaps, too true, that some attempts have been made to excite violent and armed opposition to the execution of the laws, and to murder its officers; but we are happy in believing that such incendiary doctrines find no lodgment in the minds of our citizens, and the apostles who madly propagate them will meet with but little success here. The good citizens of Pennsylvania are opposed to slavery, but they revere the constitution and laws of their country. Since the days of Franklin, associations have existed among the philanthropists, and true friends of humanity, to protect the colored man from the oppressive grasp of the kidnapper, and elevate his character; but these friends of religion and humanity have no connection with those unhappy agitators who infest other portions of the Union. and, with mad zeal, are plotting its ruin. The time has not yet come when the jury box will be contaminated by men whose moral perceptions are so perverted by a strange hallucination that they will not render a true verdict according to their oaths and the law of the land.

I have been led to make these remarks. because the subject has been brought to your attention in the course of the argument, and by the reports of meetings and conventions which must have met your eyes in every newspaper since the commencement of this trial. But I desire that you will not suffer any prejudice to arise in your minds to affect either of the parties in this case. With what may be the "peculiar opinions" of the defendants, you have no concern. They are free to entertain any opinions they may choose to adopt, and are on trial only for their acts. They are charged with having done acts contrary to law, and are entitled to your verdict, unless the plaintiffs have given satisfactory evidence to show that they have transgressed the law to the injury of the plaintiffs. The

right of the plaintiffs to support this action, as I have already stated, depends on the act of wrongness, and not on the principle of the common law. And, although the declaration does not say the offence was committed against the statute, we must look to it for the definition of the offence with which the defendants are charged. In assisting you in this investigation, I shall only state the general principles of the law applicable to the case. without any application of them to the facts of this case. For the testimony is so contradictory that the court cannot assume anything as proved, without trespassing on your peculiar province of deciding contested facts, and passing on the credibility of conflicting witnesses.

As to the nature of the harboring and concealing, which is the substance of the complaint in this case, and which would subject the defendants to liability in this form of action, I shall repeat the observations made on a former occasion: First, what is meant by "notice"; and second, what constitutes "harboring."

On the first point. the court has been relieved from much difficulty by a late case tried before Mr. Justice McLean in Ohio, and which has been affirmed in the supreme court of the United States. See Jones v. Van Zandt [Case No. 7,501]; s. c., 5 How. [46 U. S.] 216. In that case it was decided that the word "notice," as used in this act. means "knowledge"; that it is not necessary that a specific, written, printed, or verbal notice from the owner be brought home to the defendant, but that it is sufficient if the evidence show that he knew the person he harbored or concealed was a fugitive from labor.

The word "harbor" is defined by lexicographers by the words, "to entertain." "to shelter." "to secure," "to secrete." It evidently has various shades of meaning, not exactly expressed by any synonym. It has been defined in Bouvier's Law Dictionary, "to receive clandestinely, and without lawful authority, a person for the purpose of concealing him, so that another, having the right to the lawful custody of such person, shall be deprived of the same." This definition is quoted in the opinion of the court, as delivered by Mr. Justice Woodbury, in Jones v. Van Zandt, 5 How. [46 U. S.] 227, but without the intention of affirming either the authority of the book, or the correctness of the definition. For, although the word may be used in the complex meaning there given to it, it does not follow that all these conditions are necessary elements in its definition. Receiving and entertaining a person clandestinely, and for the purpose of concealment, may well be called "harboring," as the word is sometimes used. Yet one may harbor without concealing. He may afford entertainment, lodging, and shelter to vagabonds, gamblers, and thieves, without the purpose or attempt at concealment, and it may be correctly affirmed of him that he harbors them.

The act of congress. by using the terms "harbour or conceal," evidently assumed that the terms were not synonymous, and that there might be a harboring without concealment. The act seems to be drawn with great care and accuracy, and bears no marks of that slovenly diction which sometimes characterizes acts of assembly, where numerous synonyms are heaped together, and words are multiplied only to increase confusion and obscurity. But neither in legal use or in common parlance is the word "harbor" precisely defined by the words "entertain" or "shelter." It implies impropriety in the conduct of the person giving the entertainment or shelter, in consequence of some imputation on the character of the person who receives it. An inn-keeper is said "to entertain" travelers and strangers, not to "harbor" them, but may be accused of harboring vagabonds, deserters, fugitives, or thieves,—persons whom he ought not to entertain. It is too plain for argument that this act does not intend to make common charity a crime, or treat that man as guilty of an offense against his neighbor who merely furnishes food. lodging. or raiment to the hungry, weary, or naked wanderer, though he be an apprentice or a slave. On the contrary, it contemplates, not only an escape of the slave, but the intention of the master to reclaim him. It points out the mode in which this reclamation is to be made, and it is for an unlawful interference or hinderance of this right of reclamation, secured to the master by the constitution and laws, that this penalty is imposed. The harboring made criminal by this act, then, requires some other ingredient besides a mere kindness or charity rendered to the fugitive. The intention or purpose which accompanies the act must be to encourage the fugitive in his desertion of his master; to further his escape and impede and frustrate his reclamation. "The act must evince an intention to elude the vigilance of the master, and be calculated to obtain the object." Jones v. Van Zandt [supra]. This mala mens or fraudulent intent required by the act to constitute illegal harboring is not to be measured by the religious or political notions of the accused, or the correctness or perversion of his moral perceptions. Some men may conceive it a religious duty to break the law, but the law will not receive that as an excuse. If the defendant was connected with any society or association for the purpose of assisting fugitives from other states to escape from their masters, and, in pursuance of such a scheme, afforded this shelter and protection to the fugitive in question, he would be legally liable to the penalty of this act. however much his conscience, or that of his associates, might approve his conduct.

The difference between the action for the penalty and the action on the case is this: The defendants might be liable for the penalty if they illegally harbored and concealed the fugitives, even though the master may

have afterwards reclaimed them. But in an action on the case, for damages, the plaintiff must show that the slaves were lost to him through the illegal interference of the defendants, or that some other appreciable loss, injury, or damage was suffered by him in consequence thereof. In the first case he would recover the whole value of the slaves, as damages; in the latter, only to the amount of loss or actual damage which he shows he has suffered.

2 [If the owner of the fugitive does not think fit to pursue, in order to reclaim them, he cannot complain that those who have merely harbored them after their escape have injured him, unless he can connect such persons with the original escape of the slaves, and show that they seduced the slaves, and helped them to escape from the possession of their master. If the master had entirely abandoned the pursuit of his slaves and given up all attempts to reclaim them, before interference of the defendants, the whole value of the slaves could hardly be claimed as the measure of his damages, as their loss could not be then imputed to their harboring. But if the owner or his agent, pursuing the fugitives for the purpose of reclamation, should trace them to the premises of a certain individual and could trace them no farther, because they had been harbored and concealed, and carried away secretly by night, and delivered to another, who continued the same process, and the pursuit of the claimant was thus baffled, no one of those individuals thus interfering could be suffered to allege that his interference did not cause the loss of the fugitives, or that their value was not a proper measure of damages in an action for such harboring. If a number of persons combine together to commit a trespass or wrong, they are liable to damages to the extent of the whole injury. The injured party may recover judgment for the whole damage against each, and elect de melioribus damnis, as he can have but one compensation. And where a number of persons are sued for a joint trespass or tort, and the plaintiff can prove any one of them to be guilty, the jury may find the others not guilty, and assess the whole damages against that one, even though many others, known or unknown, may have combined with that one to do the act, and have not been sued. Although the plaintiff can recover but one satisfaction, the damages are indivisible, and each joint trespasser is liable for the whole.

[It will be for you, gentlemen of the jury, to apply these principles to the facts of the case before you. The evidence is very contradictory. In some cases, testimony apparently conflicting may be reconciled without imputing corrupt perjury to either side. It would be difficult, perhaps, for the most enlarged charity to do so in this case. The whole case has been argued before you with very great ability by the learned counsel, and as you are the sole judges of the facts, the court do not think it necessary to make any remarks upon them. If in your judgment, the hypothesis of the defendants' counsel is supported by the evidence; if Mr. Breckbill was merely a spectator, without counsel, interference or assistance; if Mr. Weakley did not participate in the transaction at all, you should find them not guilty. If you believe, also, that Kauffman did not assist in harboring, secreting or deporting the slaves, but merely fed them out of charity, and suffered them to rest for a few hours in his barn; that they were brought there without his knowledge, consent, or approbation, and taken away without his assistance, or any act of his, to enable them to elude the pursuit of their owners, or to further their escape, your verdict should be in his favor also. If, on the contrary, you find the hypothesis of the plaintiffs' counsel to be a true one; if, from the facts in evidence, you believe that certain persons in the region of country where the defendants reside, and including them, or any of them, were known as persons willing to assist fugitives to escape; that for this reason they were brought to the premises of Kauffman, by some person, known or unknown, who was assisting the slaves to escape; if they were received by him, harbored and secreted in his barn, then taken away by him, or by his agents or servants, after night, in order to assist them to escape, and to elude pursuit; if the slaves were thus transferred by him, with the countenance, counsel and assistance of Breckbill, to the barn of Stephen Weakley; if Weakley kept them secreted in his barn, and removed them on the following night to places unknown, and the pursuit of the owners of these slaves was thus baffled, you should find for the plaintiffs the full value of the slaves in damages, as against all the defendants, or such of them as you believe from the evidence to have had an active participation in the offence.] 2

In answer to a point put by defendants' counsel, as follows: "That if the jury shall believe that, before the negroes came or were brought by George Cole to Kauffman's barn, they had eluded the pursuit of the owner and his agent, the plaintiffs are not entitled to recover,"—the judge remarked that, in the abstract, this point was true, but it did not become the defendants to say, if it be proved that they harbored or concealed the slaves, or carried them off in their wagon, that they did not thus assist the slaves in eluding the pursuit of their owners, and frustrate their efforts to reclaim them; as much so as if a person carried off another's horse, and, when he reached a certain stage, delivered him to a comrade, who in turn delivered him to another, by which the property became entirely

lost to the owner. No one would doubt their responsibility.

Have you evidence to satisfy your minds that the defendants, or any of them, harbored or concealed the fugitives mentioned in the declaration? Did they do this, knowing them to be fugitives from labor, and to further promote their escape from the pursuit or reclamation of their masters? Did they, by such harboring and concealing, cause the escape of the fugitives, or hinder their recapture? If you find these facts to be true, your verdict should be for the plaintiffs for the value of the slaves, say $3,000, and interest, if you see fit to add it. But the burthen of proof is on the plaintiff, and unless he has made out his case by satisfactory evidence, you should find for defendants, or for such of them as have not been proved to be guilty. You should suffer no prejudice to operate on your minds against either party on account of any "peculiar notions" either you or they may entertain on the subject of slavery. In this court the same equal and exact justice should be meted out both to master and servant,—to slaveholder and Abolitionist. With these remarks, the case is committed to you.

The jury, failing to agree, were discharged, standing ten for the plaintiffs, and two for the defendants.